

U.S. Department of Justice

United States Attorney
Eastern District of New York

TH:JPM/EJD
F#: 2020R01027

271 Cadman Plaza East
Brooklyn, New York 11201

August 9, 2021

By ECF

The Honorable Sanket J. Bulsara
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Quintin Green, et al.
               Criminal Docket No. 20-331 (S-1) (LDH)

Dear Judge Bulsara:

        The government respectfully submits this letter in support of its motion for a permanent order of detention as to defendants Quintin Green and Kevin Wint. Green, Wint, and their co-defendants Chayanne Fernandez and Maliek Miller, who are already detained on prior federal charges, are members of a violent street gang – the Ninedee Gang – in Brooklyn, New York. As described below, defendant Green is charged with, among other offenses, carrying out the brutal murder of a former federal witness, and defendant Wint, a leader of the gang, is charged with racketeering and being an accessory after the fact to that murder. As to both defendants, the charges they face trigger the presumption that "no condition or combination of conditions will reasonably assure the appearance of the [defendants] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A), (B). For the reasons set forth below, the Court should enter permanent orders of detention.

I.      The Charged Offenses

        The defendants Quintin Green (also known as "Wild Child"), Kevin Wint (also known as "Kev G"), Chayanne Fernandez (also known as "White Boy") and Maliek Miller (also known as "Leek")[1] are charged in a superseding indictment (the "Superseding Indictment") with violent crimes, as well as drug and fraud offenses, arising out of their membership in the Ninedee Gang, a local street gang that operates out of the New York City

---

[1] Defendants Miller and Fernandez are already subject to permanent orders of detention. See United States v. Miller, 20-CR-331 (LDH), ECF Dkt. No. 16; United States v. Chayanne Fernandez, 20-CR-397 (NGG), ECF Dkt. No. 4.

Housing Authority Louis H. Pink Houses (the "Pink Houses") in the East New York neighborhood of Brooklyn.  The Ninedee Gang is affiliated with certain residential buildings in the Pink Houses and associated with a gang called the "Loopy Gang."  Ninedee members also affiliate with the Eight Trey Crips and certain Ninedee members are also Eight Trey Crips.  The gang's members support themselves through drug sales, principally by selling the gang's branded marijuana, "90 Runtz," as well as crack cocaine, and also through various "scamming" offenses, which involves using stolen credit card and identity information to make purchases.  The gang, as well as its affiliated gangs, have longstanding rivalries with other criminal gangs in East New York and within the Pink Houses.

       Count One of the Superseding Indictment charges racketeering, in violation of 18 U.S.C. § 1962(c), against defendants Wint, Fernandez, and Miller.  Racketeering Act One alleges that all three defendants conspired to commit a drug trafficking offense; Racketeering Act Two alleges that the defendant Wint conspired to commit access device fraud; and Racketeering Act Three alleges that defendants Fernandez and Miller committed, and conspired to commit, the murder of Shatavia Walls.  Count Two charges defendants Wint, Fernandez and Green with drug trafficking conspiracy, in violation of 21 U.S.C. § 846. Counts Three and Four charge defendants Green, Fernandez and Miller with conspiracy to commit murder in-aid-of racketeering and murder in-aid-of racketeering, respectively, in violation of 18 U.S.C. § 1959(a).  Counts Five and Six charge Green, Fernandez and Miller with unlawful use of firearms related to crimes of violence, in violation of 18 U.S.C. §§ 924(c) and 924(j).  Count Seven charges defendant Miller with being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g).  Count Eight charges defendant Wint with being an accessory after the fact to murder, in violation of 18 U.S.C. § 3.  Count Nine charges defendant Green with attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a).

       The most serious charges in the Superseding Indictment relate to the July 7, 2020 murder of Shatavia Walls, a former federal witness.  Ms. Walls had testified in a criminal trial in this District in June 2019 against a member of the Loopy Gang and, in particular, testified that the gang member had shot her at the Pink Houses in the fall of 2017. Prior to that trial, Ms. Walls had been subject to significant witness intimidation, including the public posting of flyers calling her a "rat" throughout the Pink Houses.  During the night on July 7, 2020, Ms. Walls was shot numerous times by two assailants—defendant Quintin Green and a juvenile male.

       At trial, the government will demonstrate that the plot to murder Ms. Walls was formed by members of the Ninedee Gang, including defendants Green, Miller, Fernandez and others, after they learned of a dispute between Ninedee members Maliek Miller and Chayanne Fernandez and Ms. Walls that occurred on the Fourth of July 2020. During that confrontation, defendant Miller called Ms. Walls a "snitch," a reference to her prior testimony at a federal trial, and fired a gunshot into the air.

       In the days following the confrontation, members of the Ninedee Gang, including Green, developed a plan to murder Ms. Walls.  Three days after the Fourth of July

2

incident, Green and a juvenile male waited at the Pink Houses all afternoon and through the early evening for an opportunity to shoot Ms. Walls, changing their clothes throughout the day in order to disguise their appearance.  At approximately 9:25 p.m., as Ms. Walls was walking alone on an outdoor path inside the Pink Houses, Green approached her from behind.  As captured on surveillance video, after Ms. Walls turned to face Green and appeared to exchange words with him, Green raised his arm and fired a gunshot at Ms. Walls.  The gunfire caused bystanders to flee into a nearby building; one bystander was struck by a bullet fired by Green.  Ms. Walls turned to flee from Green, who then leapt over a fence and chased her, continuing to fire at her as she attempted to run away from him.  Surveillance video reflects that the juvenile male then began to fire at Ms. Walls as she ran towards him.  Green caught up to Ms. Walls and fired multiple gunshots towards her, causing her to fall along a pathway behind 2678 Linden Boulevard.  Green and the juvenile male then fled the area.  Following the murder and increased law enforcement presence at the Pink Houses, certain of the defendants fled the Pink Houses to a location in Queens with the assistance of Wint.

Ms. Walls died at a hospital as a result of complications from gunshot wounds on July 17, 2020.

Following the homicide, multiple members of the Ninedee Gang appeared to claim credit for the murder on social media.  For example, Wint posted a New York Daily News article about the shooting of Ms. Walls on July 9, 2020:



As the post reflects, Wint's account contains the word "Ninedee" in its display name. Below this post, Green, using a Facebook account with the name "Wildkhild," posted the word "Ninedee," claiming the shooting for the gang. About a week prior to this post, the defendant Fernandez had used his Facebook account to link to a news article about a gunman who had shot a cab driver in Brooklyn and wrote the caption, "DAMN REST UP SMH THAT's 90," implying the gang was involved in the homicide.

Defendants Wint, Fernandez, and Miller are also alleged to have participated in drug trafficking and Defendant Wint is charged access device fraud offenses in connection with their membership in the Ninedee Gang. The Ninedee Gang also has significant access to firearms, as reflected by the fact that the defendant Fernandez is separately charged with two firearm offenses in this District. See Docket No. 20-CR-397 (NGG). Those charges relate to two separate firearm possession incidents from 2019 and 2020, including a shooting committed by Fernandez at the Pink Houses.

Finally, Green is also charged with the attempted robbery of a Target store in Staten Island on November 3, 2020. Surveillance video demonstrates, and reports from store employees confirms, that Green and another individual attempted to steal two large high-definition televisions from the Target. After a security guard stopped Green and his companion, Green briefly walked away. With the security guard looking away, defendant Green punched her from behind. After the security guard fell, Green grabbed a television

4

and ran for the parking lot.  There, he was intercepted by another security guard and gave up the television.  Green was then arrested by the NYPD as he tried to flee.

II.     Legal Standard and Procedure

The Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141-3156, "requires that an accused be detained pending trial where, following a hearing in accordance with § 3142(f), 'the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'"  United States v. English, 629 F.3d 311, 318 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(1)).  While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

In cases like this one, involving crimes of violence and specified violations of the Controlled Substances Act, "it shall be presumed," subject to rebuttal by the defendants, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3).  The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community."  Id.  A defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).  Even if a defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id.

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).  Indeed, danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking."  United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).  When a finding of dangerousness is related to violent conduct, it need not be shown that the defendant personally engaged in violence.  United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985).

Four factors guide the Court's determination of whether a defendant should be released on bail:

> (1)     "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm . . .";
>
> (2)     "the weight of the evidence against the person";

5

>  (3) "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and] criminal history, and record concerning appearance at court proceedings"; and
>
>  (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or even for discovery." Id. (internal quotation marks omitted). The Second Circuit has reversed district courts where they have not credited the government's proffer, including proffers with respect to a defendant's dangerousness. See, e.g., Mercedes, 254 F.3d at 437 ("Roman has twice been convicted of weapon possession – one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to Roman's dangerousness.").

IV. Argument

  A. The Defendants Pose a Danger to the Community

No bail package will protect the community from the danger posed by the defendants. Because defendant Green has been indicted for a crime for which the maximum term is life and offenses under 18 U.S.C. § 924(c), there is a presumption that there are no conditions of release that can reasonably assure their appearance and the safety of the community. See 18 U.S.C. § 3142(e)(3). The same presumption applies to defendant Wint on account of his drug-trafficking charge in Count Two. See id. The defendants cannot rebut such a presumption, regardless of any bail package that may be proposed, because the relevant considerations under the Bail Reform Act clearly support a finding of dangerousness and risk of flight.

The defendants cannot overcome the presumption that they are a danger to the community. The violent crimes with which they are charged—murder, murder conspiracy, accessory after-the-fact to murder, firearms and robbery—are very serious offenses. The murder at issue here was based on witness retaliation and the senseless promotion of gang violence. The evidence showed that the defendants worked over several days to plan, target, and carry out the premeditated murder of Ms. Walls. The defendants also knew of the

victim's status as prior federal witness prior to killing her. In broadcasting their role in her murder on social media, the defendants were both claiming credit for the murder but also sending a message to others who would assist law enforcement.

Second, membership in a violent enterprise like the Ninedee gang is itself an ongoing danger to the community. The Ninedee Gang affiliates with other violent street gangs, and its members often share multiple allegiances with other gangs. Within the Pink Houses, the factional rivalries furthered by the Ninedee Gang and others wreak havoc on the community's residents. Wint held a senior position within the gang was therefore known as a "Big Ninedee." Wint has prior convictions for Criminal Possession of a Weapon in the Fourth Degree in violation of N.Y.P.L. § 265.01(1) (2013), for which he was sentenced to one year in prison, Conspiracy in the Fifth Degree (2015), for which he was sentenced to one year in prison. Additionally, Wint has a prior conviction for Possessed of a Forged Instrument in the Third Degree (2015). He committed several of the offenses with which he is now charged while on pre-trial release for a still-pending Criminal Possession of a Weapon charge in Kings County Supreme Court, for which he had been indicted in 2019. Green also has a prior conviction for criminal possession of a firearm, and was on probation at the time he murdered Ms. Walls.

Third, the Ninedee Gang and associated gangs within the Pink Houses, actively target those who cooperate with law enforcement. As described above, Miller called Ms. Walls a "snitch" before discharging a firearm on July 4 in an attempt to threaten her. He then participated in the plot to murder her. Miller also has posted on his Facebook account describing those who help law enforcement as "rats." Just over a month after the shooting, Miller posted such a message (using an emoji of a rat) while referring to the gang. Wint has also posted police paperwork and photographs referring to "RAT[s]" on his Facebook.

Finally, prior interactions with the criminal justice system appear to have had little deterrent effect on the defendants; each defendant charged in the Superseding Indictment carried out his role in the offense despite being under some form of court supervision (parole, probation or pre-trial release) at the time of Ms. Walls's murder. That is why the Second Circuit has repeatedly rejected elaborate bail packages for violent defendants, even ones that include "home detention and electronic monitoring," which the Court has explained try to "replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions." United States v. Millan, 4 F.3d 1039, 1049 (2d Cir. 1993) (citation and internal quotation marks omitted).

  B. <u>The Defendants Pose a Risk of Flight</u>

The defendants all pose a significant risk of flight given the nature of the offenses charged and strength of the government's case. Three defendants—Green, Fernandez, and Miller—are charged with capital offenses. If convicted of the murder charges, they face a minimum sentence of life imprisonment. As to defendant Wint, who is

7

charged with racketeering, being an accessory after the fact to murder, and drug trafficking, he faces significant term of imprisonment, in addition to open charges in state court.

The government's evidence is also strong. The government has video surveillance evidence capturing the murder of Ms. Walls, various of the defendants meeting before the shooting, and the defendants' subsequent flight. The government's proof at trial will include, among other evidence, testimony from several witnesses present at the Pink Houses at the time of the murder; cell-site records; posts and communications from social media accounts belonging to the defendants; and ballistics evidence. Ballistics recovered from the location of the murder confirms that two firearms were used in the murder. That evidence further showed that one of murder weapons was the same handgun used by defendant Miller when he fired the gunshot at the confrontation with the victim three days earlier.

When the incentives to flee are so strong, as here, no combinations of sureties and other restrictions can assure their appearance. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant was charged under § 924(c), faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x. 470, 471 (2d Cir. 2003) (summary order) ("the presumption regarding flight risk has changed because Becton now faces a ten-year mandatory minimum sentence"). That remains true even if the defendants accept electronic surveillance and home confinement. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

V.     Conclusion

For the foregoing reasons, the government respectfully requests that the court issue permanent orders of detention against defendants Quintin Green and Kevin Wint to ensure their return to court and the safety of the community.

Respectfully submitted,

JACQUELYN M. KASULIS
Acting United States Attorney

By:     /s/
James P. McDonald
Emily J. Dean
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of the Court (by ECF)