

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DGR:EJD/MS/IC   *271 Cadman Plaza East*
F. #2020R00697   *Brooklyn, New York 11201*

November 1, 2024

By ECF

The Honorable LaShann DeArcy Hall
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Quintin Green
     Criminal Docket No. 20-331 (S-2) (LDH)

Dear Judge DeArcy Hall:

  The government respectfully submits this letter in anticipation of defendant Quintin Green's sentencing in the above-captioned case, which is scheduled for November 19, 2024 at 11 a.m. On April 18, 2024, the defendant pleaded guilty to causing the death of Shatavia Walls through use of a firearm and attempted Hobbs Act robbery, pursuant to an agreement under Federal Rule of Criminal Procedure 11(c)(1)(C) (the "Plea Agreement"). Quintin Green is a member of the Ninedee Gang who is directly responsible for the murder of former federal witness Shatavia Walls—he chased her down and shot her multiple times, killing her. Green enthusiastically opted to be one of the two shooters participating in the Walls murder and claimed the murder for the Ninedee Gang on Facebook after its completion.

  For the reasons set forth below, the government recommends that the Court impose a sentence of 420 months' imprisonment, the agreed-upon sentence specified in the Plea Agreement.

I. Background

  The facts underlying the offense conduct in this case are accurately set forth in the Presentence Investigation Report ("PSR") prepared by the United States Probation Department ("Probation") on October 3, 2024.

A.     The Defendant is a Member of a Violent Street Gang

The defendant was a member of the Ninedee Gang, a violent criminal enterprise operating out of the Louis H. Pink Houses public housing complex (the "Pink Houses") in the East New York neighborhood in Brooklyn.[1]  PSR ¶¶ 6, 11.  The Ninedee Gang was a successor to two violent Pink Houses gangs that preceded it—Money Making Gangsters ("MMG") and the Loopy Gang.  Like its predecessors, Ninedee Gang members were affiliated with specific buildings within the Pink Houses complex, specifically, the "5" and "6" buildings.  See id. ¶ 12.  They engaged in a violent and bloody gang war with rival gang members and those they deemed affiliated with rival gangs.  See id.  This ongoing violence raged within the Pink Houses for decades on a near-daily basis as members of MMG, the Loopy Gang and, in recent years, the Ninedee Gang terrorized the neighborhood, trading gunfire with rival gangs without regard to the men, women and children who resided in the massive housing complex.  In addition to the violence, Ninedee Gang members supported the gang through drug sales and large-scale financial fraud, among other crimes.  Id.   Members of the enterprise who were on the street were responsible for generating money—typically through a pattern of racketeering activities—and paying "dues" for the benefit of the gang, including to incarcerated members of the gang.

While the Ninedee Gang committed violence against numerous groups that they considered to be their opposition, or "ops," the Ninedee Gang's central rivalry was the one within the Pink Houses between the "5" and "6" buildings of the Pink Houses (affiliated with MMG, the Loopy Gang and the Ninedee Gang) and the "7" and "8" buildings (associated with rival gang members including, most recently, members of the Makk Balla Brims set of the Bloods street gang).  See id. ¶ 13.  A common Ninedee Gang initiation and subsequent practice was to "spin the 8s," which meant members and prospective members of the Ninedee Gang ambushed rivals in the vicinity of the "7" and "8" buildings of the Pink Houses and opened fire.[2]

Younger members of the gang, such as the defendant, proved their loyalty to the gang in more than one way.  Some earned respect through scamming, selling drugs and making money for the gang; others did so by committing acts of violence.  The defendant chose to earn status in the Ninedee Gang through advertising his willingness to shoot rivals.  The defendant became known as "Wild Child," due to his reputation for violence.  Due to this reputation and the fact that he lived outside of the Pink Houses, the defendant was one of the first individuals chosen by more senior members of the Ninedee Gang to shoot and kill Walls.  See Trial Tr. at 1292 ("Wild Child is on time and he's on go and he's willing to do whatever for us"); Trial Tr. at 1292 ("[Wild Child] was already known to be a gang member and a shooter and he was willing to do whatever").

---

[1]     The Pink Houses complex consists of 22 eight-story buildings with 1,500 apartment units covering over 31 acres and houses over 3,000 residents.

[2]     Younger members of the gang, such as the defendant, were often told that they had to "spin the 8s" to "be" Ninedee.

2

B. <u>The Murder of Shatavia Walls by Ninedee Gang Members</u>

On July 7, 2020, at approximately 9:25 p.m., the defendant and fellow Ninedee Gang member Joe Santana repeatedly shot Shatavia Walls in front of 2678 Linden Boulevard within the Pink Houses. PSR ¶ 21. Ms. Walls was a Ninedee Gang rival and testified against a member of the Loopy Gang in a 2019 federal criminal trial in this District. Id. at 14.[3] She was hospitalized immediately after the shooting and died approximately ten days later from multiple complications of the gunshot wounds to her torso.[4] See id. at 25. After the shooting, other Ninedee members aided the defendant in avoiding detection by law enforcement, including by assisting the defendant in escaping the Pink Houses by taking him to a hotel room in Queens, paid for by Ninedee Gang leader Kevin Wint, where he could spend the night. See PSR ¶ 23. The defendant and Santana committed this murder not only with the knowledge that Ms. Walls had previously testified for the government against an associate of the Ninedee Gang, but motivated in part by that fact.

In June 2019, Ms. Walls testified for the government during a federal criminal trial in the Eastern District of New York, <u>United States v. Shakeem Boykins</u>, No. 18-CR-338 (ERK). See id. ¶ 14. Boykins was charged with being a felon in possession of a firearm in connection with shooting Ms. Walls in 2017. Ms. Walls testified, among other things, that in October 2017 she had been shot by Boykins while at the Pink Houses and sustained two gunshot wounds. See id. Boykins was convicted following trial and sentenced to 110 months' imprisonment. Prior to the <u>Boykins</u> trial, Jahmeek Hudson, an individual associated with the Loopy Gang, had placed posters around Pink Houses buildings that read: "Shatavia Been a Rat And She Still Ratting."[5] See id. This strategy of publicizing the names of those who were cooperating with law enforcement by posting police reports throughout the Pink Houses was one employed repeatedly by the Ninedee Gang. It was designed to have a chilling effect on cooperation with law enforcement while, at the time, advertising the names of those to be targeted for "snitching." Indeed, Ms. Walls became a high-value target for the Ninedee Gang, as they held her responsible for Boykins' incarceration.

---

[3] Ms. Walls and her husband were both Loopy Gang and Ninedee Gang rivals, associated with the "7" and "8" buildings of the Pink Houses. Ms. Walls's husband was a member of the Makk Balla Brims.

[4] A second individual, who was a resident at the Pink Houses, was also shot during the fatal attack on Ms. Walls, but survived. Video surveillance demonstrates that the defendant fired the shot that struck the bystander. See GX 124 at 1:10:27-1:10:42; 1:15:00-1:15:25; PSR ¶ 21.

[5] Hudson was subsequently charged with witness tampering in connection with placing the posters in the Pink Houses' lobbies and making threatening calls to Ms. Walls and her family members. Hudson pleaded guilty to witness tampering offenses and was sentenced to 30 months' imprisonment. See <u>United States v. Jahmeek Hudson</u>, No. 19-CR-259 (BMC).

On July 4, 2020, Ninedee Gang members including co-defendant Santana, co-defendant Shakur Bey and co-defendant Chayanne Fernandez, among others, were involved in a confrontation with Ms. Walls over Ninedee Gang members lighting off fireworks in the vicinity of children. See PSR ¶ 16. The confrontation turned physical between Ms. Walls and Ninedee Gang members. After the fight, co-defendant Maliek Miller was called to come to the Pink Houses, at which time a second confrontation with Ms. Walls ensued that led to Miller firing a gunshot.[6] See id. ¶ 17. During the confrontation, Miller called Ms. Walls a "snitch," in reference to her prior testimony against Boykins. Id. During the confrontation, Miller dropped his identification—Ms. Walls and her associates recovered his identification and the shell casing left behind from Miller's fired shot. Id. This incident was one of many in the longstanding conflict between Ninedee Gang members and Ms. Walls and her associates from the "7" and "8" buildings.

After the July 4 incident, Ninedee Gang members, including the defendant, Miller, Fernandez, and Santana, solidified the plan to shoot and kill Ms. Walls. See PSR ¶ 18. The group discussed how Ms. Walls was a "rat" and was responsible for Shakeem Boykins' incarceration. On subsequent days, Miller sent armed members of the Ninedee Gang looking for Ms. Walls to shoot and kill her, including the defendant. On July 7, 2020, the day of Ms. Walls's murder, the defendant, Miller, Fernandez, Wint, Santana and other Ninedee Gang members gathered together at the Pink Houses. Over the course of days, Miller and others repeatedly sought out members and associates of the gang with less status to shoot and kill Ms. Walls.[7] The defendant was involved in multiple meetings regarding killing Ms. Walls, and volunteered to commit the murder. See PSR ¶ 20. On the day of the murder, the defendant and Santana were the designated shooters. While waiting for their opportunity to shoot and kill her, both the defendant and Santana changed their clothes and covered their faces to disguise their appearance. PSR ¶ 21. At approximately 9:27 p.m., Ms. Walls was walking alone on an outdoor path inside the Pink Houses when the defendant approached her from behind. Id.; GX 124 at 1:10:36.[8] As captured on surveillance footage, after Ms. Walls turned to face the defendant, he raised his arm and began shooting at Ms. Walls. Id. Ms. Walls then turned to run away from the defendant, who leaped over a fence and chased her in the direction of Santana, continuing to

---

[6] The PSR indicates that Miller fired a shot "in the air" during this confrontation. The government requests that the phrase "in the air" be removed and the PSR be amended to reflect that Miller fired a shot during the confrontation. As it reads now, the PSR suggests that Miller purposefully fired a shot in a way so as not to strike any individuals, which is not clear from the evidence. See PSR ¶ 17.

[7] While the group collectively wanted to shoot and kill Ms. Walls, their awareness that she was a former federal witness both increased the respect that a member would earn for the commission of the crime and increased the risk associated with doing so.

[8] The government exhibits referenced herein refer to exhibits entered into evidence at trial in United States v. Miller, 20-CR-331 (S-2) (LDH) and will be provided to counsel for the defendant.

4

shoot at her as she attempted to flee from him. Id.; GX 124 at 1:10:45-1:10:58. At the same time, as Ms. Walls tried to run away from the defendant by running towards Santana, the defendant shot repeatedly at Ms. Walls. Id. The defendant then caught up with Ms. Walls and shot at her over and over again, causing her to fall to the ground, at which point he continued shooting her. Id. The defendant and Santana then fled into co-defendant and fellow Ninedee Gang member Shakur Bey's apartment. Id. at ¶ 22.

Inside Bey's apartment, the defendant, Santana and other Ninedee members convened, and the defendant and Santana recounted the shooting. Id. ¶ 22. The defendant and Santana argued over who actually hit Walls with shots.[9] Bey destroyed clothing that the defendant and Santana had worn during the shooting by putting it down an incinerator chute in the apartment building. Id. A co-conspirator even memorialized the defendant and Santana lounging post-shooting inside Bey's apartment after they had removed some of the clothes worn during the commission of the crime:



Due to the increased law enforcement presence in and around the Pink Houses following the shooting, it became immediately necessary for those involved to escape the Pink Houses undetected. Wint, who was not at the Pink Houses at the time Ms. Walls was shot, rented a hotel room at a Best Western Hotel near John F. Kennedy International Airport for his fellow Ninedee Gang members to provide a location where they could hide out overnight. See id. ¶ 23. The defendant, Fernandez and another Ninedee Gang member traveled from the Pink Houses to the Best Western hotel, and Bey called an Uber for Santana so that he could get out of the Pink Houses and home to Queens. Id. ¶ 23.

---

[9] Ballistics evidence indicates that the defendant fired at least eight times, as he was in possession of a .40 caliber firearm and eight .40 caliber shell casings were recovered from the crime scene. Santana fired at least two times, as two .380 caliber shell casings were recovered from the crime scene. Based on the government's evidence, the defendant fired a .40 caliber firearm while Santana fired a .380 caliber firearm.

Miller, Wint, Fernandez and the defendant, among others, then convened and spent the night together in the Best Western hotel room provided by Wint. See id. When the defendant recounted shooting Ms. Walls to Wint and Miller, Wint repeatedly stated "that's Ninedee," meaning that the shooting was consistent with the Ninedee Gang's goals to commit violence against the gang's rivals and prevent cooperation with law enforcement. The group left the hotel on July 8, 2020, whereupon Wint and Miller took the defendant to a location in the Brownsville neighborhood of Brooklyn, to continue to conceal the defendant's whereabouts. The next day, on July 9, 2020, Wint publicized the shooting of Ms. Walls on his Facebook page "Kev G Suppa Ninedee," to which the defendant, under his Facebook name "Moet Boy Wildkhild," commented "Ninedee" to claim credit for the shooting on behalf of the gang:



PSR ¶ 24; GX 879S.

Subsequent to the defendant's participation in the shooting, the defendant and others got "points" within the gang for successfully murdering Walls. Trial Tr. at 1334. This signified that the defendant had elevated status within the Ninedee Gang as a result of this act of violence. Id. at 1333-1334. Prior to the defendant's arrest in August 2021, the defendant inquired of another Ninedee Gang member if the defendant should murder Santana, as Santana was with the defendant when the defendant shot and killed Ms. Walls and thus could potentially serve as a witness against the defendant and others. Trial. Tr. at 1348-1349. Santana was a juvenile at the time he committed the murder alongside the defendant, and at the time the defendant suggested murdering Santana.

6

E. <u>The Defendant's Attempted Robbery of a Target Store</u>

In addition to this murder, the defendant separately pleaded guilty to attempting to commit a November 3, 2020 Hobbs Act robbery of a Staten Island Target store. PSR ¶ 27. The defendant attempted to exit the Target with two flat screen televisions and was stopped by a security guard. Id. The defendant then punched the security guard, causing her to fall, and attempted to flee with one of the two televisions. Id. The defendant was unable to escape with the television, and was arrested by police after fleeing the scene in a vehicle. Id.

F. <u>The Defendant's Arrest and Subsequent Conviction</u>

The defendant was arrested and arraigned on August 9, 2021. PSR ¶ 28. At the time of his arrest, the defendant fled on foot from law enforcement who ultimately apprehended him. After his arrest, in a post-<u>Miranda</u>, videotaped interview with law enforcement, the defendant confessed to his role in this crime. For his actions, the defendant was charged with murder in-aid-of racketeering, in violation of Title 18, United States Code, Section 1959(a)(1), conspiracy to commit murder in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(5), causing the death of Shatavia Walls through use of firearms, in violation of 18 U.S.C. § 924(j)(1), unlawful use of firearms, in violation of 18 U.S.C. § 924(c), and attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a). On April 18, 2024, four weeks before trial commenced in this matter, the defendant pleaded guilty pursuant to the Plea Agreement to causing the death of Shatavia Walls through use of firearms and attempted Hobbs Act robbery. See Dkt. No. 20-CR-331 (S-2) (LDH), ECF No. 162. On April 25, 2024, the Court accepted the defendant's plea.

G. <u>The Defendant's Prior Criminal History</u>

The defendant has the following criminal history:

- Subsequent to a September 28, 2017 arrest at age 17 for possessing a stolen firearm, the defendant pleaded guilty to Criminal Possession of a Loaded Firearm on August 20, 2018, in violation of New York Penal Law § 265.01. The defendant was sentenced to 16 months to 4 years' incarceration, received youthful offender status, and was on probation through January 2022;

- Subsequent to an April 22, 2014 arrest for committing a gunpoint robbery at age 13, the defendant pleaded guilty to Robbery in the Second Degree in 2014 and was sentenced to 18 months' probation. As this was a juvenile adjudication, this disposition was sealed.

PSR ¶¶ 59-60. Additionally, the defendant has had numerous disciplinary issues while incarcerated on this matter, including, but not limited to, refusing to obey orders while incarcerated in the Metropolitan Detention Center ("MDC") and fighting another inmate. PSR ¶ 84. In 2023, at the defendant's request, the defendant was transferred to a facility outside of

7

New York City ("Facility-2"), where he continued to have disciplinary issues, including the following:

- On September 7, 2023, the defendant engaged in a physical fight with another inmate.

- On September 26, 2023, a letter was found in the defendant's cell in which the defendant requested that the recipient assist the defendant's mother in bringing ceramic razors into the jail during a visit.

- On October 21, 2023, the defendant was overheard on a phone call planning to bring ceramic blades into the jail during a visit. Officers subsequently searched the defendant's cell and found a 6-inch piece of metal sharpened to a point.

Due to the above-described disciplinary issues, the defendant was transferred from Facility-2 to a different correctional facility in another location ("Facility-3"). The defendant was then removed from Facility-3 after being the subject of nine disciplinary reports, including the following:

- On January 4, 2024, an inmate ("Inmate-1") reported that the defendant punched him in the face for not paying the defendant "rent." Inmate-1 went to the hospital for an injury to his lip.

- On January 21, 2024, the defendant and an inmate ("Inmate-2") were involved in a physical fight that had to be broken up by force after the defendant and Inmate-2 failed to obey orders to stop fighting.

- On January 26, 2024, the defendant was found in possession of a one-inch piece of plastic that had been sharpened to a point. The defendant had concealed this item under his mattress in his cell.

- On February 6, 2024, the defendant was involved in a physical fight with 5 other inmates. The inmates ignored commands to stop fighting and pepper spray was used to gain compliance.

- On March 1, 2024, the defendant was involved in a physical fight with three other inmates, during which correctional officers used pepper spray to stop the fight. During the fight, one of the inmates ("Inmate-3") suffered nine puncture wounds, two slash wounds to his face and a dislocated shoulder. Inmate-3 stated that he was involved in a fight with the Gorilla Stone Bloods the day prior and that is why he was jumped by the defendant and the other inmates.

8

- On March 20, 2024, an inmate ("Inmate-4") was assaulted by multiple inmates. Inmate-4 identified the defendant as being one of the individuals who assaulted him.

II. <u>Sentencing Guidelines Calculation</u>

The government agrees with the Probation Department's calculation of the Guidelines total offense level as set forth in the PSR. The PSR calculates the Guidelines total offense level to be 40, based upon an adjusted offense level of 43 and a three-level reduction for acceptance of responsibility. PSR ¶¶ 37–58. Accordingly, based on a Criminal History Category of II, a total adjusted offense level of 40 yields a Guidelines advisory range of 324 to 405 months of imprisonment. PSR ¶ 110. However, pursuant to the Plea Agreement, the parties agree that a specific sentence of 420 months' imprisonment, followed by a period of supervised release of five years, is the appropriate term of imprisonment and supervised release in this case. Plea Agreement ¶ 2.

III. <u>Legal Standard</u>

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." <u>Id.</u> at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

 (B) to afford adequate deterrence to criminal conduct; [and]

 (C) to protect the public from further crimes of the defendant.

18 U.S.C. § 3553(a)(2). Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

9

IV.  Discussion

The government respectfully submits that the agreed upon sentence of 420 months' imprisonment is appropriate in this case and would be sufficient, but not greater than necessary, to serve the statutory purposes of sentencing.

A.  The Nature and Circumstances of the Offense

The government respectfully submits that the Court should impose a sentence of 420 months' imprisonment because such a sentence is appropriate to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Such a sentence will both provide appropriate punishment for the "nature and circumstances of the offense" as well as further the aims of specific and general deterrence. See id. §§ 3553(a)(1), (a)(2)(B) & (a)(2)(C).

Few crimes are more serious, with a greater long-term effect on our system of justice, than the murder of a federal witness. See 18 U.S.C. § 3553(a)(1). The ability to prosecute violent crime hinges on the willingness of witnesses to come forward. If prospective witnesses believe that they will be harmed or killed as a result of their cooperation, they will remain silent. Law-abiding citizens within our communities must be able to report crime to the authorities without risk of bodily harm or death. The defendant's gang, and the defendant's actions, sought to prevent just that. The defendant's gang took action based on the principle that those who cooperate with law enforcement are deemed "rats." They publicly harassed these individuals on social media, in songs, and posted police paperwork purporting to confirm their status to mark them publicly for intimidation and harm. The defendant's gang targeted those who cooperated with law enforcement in an effort to prevent arrests and convictions while terrorizing their community in East New York.

The defendant was deeply involved in the extensive planning of Walls' murder and enthusiastically agreed to be one of the shooters to kill her. Over a period of days, he came to the Pink Houses to conspire with fellow gang members and to plan the murder of Ms. Walls. Ms. Walls was specifically targeted by Ninedee Gang members after being called a "rat" in retaliation for her testimony against Boykins. This, coupled with her status as a Ninedee Gang rival due to her affiliation with rival Pink Houses buildings, led to Ms. Walls' coordinated execution by the defendant and other members of the gang. And the defendant was not just part of the plan to kill Ms. Walls. He was one of the individuals who personally committed the murder. The defendant attended numerous meetings with co-conspirators and set out with a gun more than once to kill Ms. Walls. On July 7, 2020, he changed his clothes to blend into the night – covering his face with a hoodie that he borrowed from a co-conspirator. He chose to use a .40 caliber firearm rather than the .380 shot by Santana because, as he told Santana, the .40 caliber was the stronger of the two guns. See Trial Tr. at 1306. He and Santana were strategic when they ambushed Ms. Walls—they spread out tactically and boxed her in, so that as Ms. Walls ran from the defendant she ran towards an armed Santana. See GX 124 at 1:10:40-1:10:57. Moreover, the video surveillance in this case demonstrates that as Ms. Walls ran for her life, the defendant chased her down and shot at her repeatedly until she fell to the ground. Id. The

premeditated and cold-blooded nature of this crime—as evidenced by the extensive coordination over days between co-conspirators and the video surveillance showing the defendant and Santana changing clothing to disguise their appearance before the murder —make it particularly worthy of significant sanction.

Immediately after the shooting, the defendant and Santana bragged to other gang members about whose shots hit Ms. Walls' body, in an effort to take credit for her death and maximize their own value to the gang. The gang, and specifically, this defendant, then claimed credit for the shooting on social media. An act of violence such as this has the effect of inspiring other members and associates, including lower-ranking members, to engage in more violence. This act on behalf of the gang instilled fear within innocent members of the community, including people in the Pink Houses courtyard and inside their homes who saw and heard the murder, and made it impossible for law-abiding citizens, especially those with children, to live a normal life. Moreover, the murder of a former witness has a chilling effect on any person considering cooperating with law enforcement, reporting violent crime, or so much as calling 911—let alone those that are asked to testify in open court at trial.

When he participated in Ms. Walls' murder, the defendant knew full well that she had previously testified for the government after a Ninedee associate shot her. This fact made Ms. Walls a more "valuable" target. Ms. Walls' cooperation with law enforcement was publicized by the gang around the Pink Houses in 2019 and was repeatedly discussed in the days leading up to her murder. Further, the July 4, 2020 fight between Ms. Walls, co-defendant Miller and others during which Miller fired a shot left Miller vulnerable to arrest and prosecution, as Miller's identification was recovered. Killing Ms. Walls "solved" a number of problems for the gang—she was romantically linked to a Ninedee rival, she was "responsible" in their minds for Boykins' incarceration, and she could report Miller's conduct to the authorities. As such, any member of the gang who "stepped up" to commit the murder would earn significant status and respect within Ninedee. The defendant took it upon himself to be that person. Thus, with respect to § 3553(a)(1), the seriousness of the defendant's crime warrants a significant sentence.

This conduct was not isolated. As described by a witness at trial, the defendant became a member of the Ninedee Gang by spending time with the gang members, shooting people and beating people up. Trial Tr. at 1066. The defendant was thought of within the gang as "front line," which a term used to describe someone who is willing to shoot and kill for the gang. Id. at 1066-1067. This, coupled with the fact that he was not from the Pink Houses and would be more difficult for law enforcement to identify, was precisely why the defendant was selected by the gang to kill Ms. Walls.

In light of the nature and circumstances of the offenses committed by the defendant, a term of imprisonment of 420 months is appropriate.

11

B. <u>The History and Characteristics of the Defendant</u>

With respect to the defendant's history and characteristics, although there are mitigating factors, a full analysis still supports the significant sentence agreed upon by the parties. <u>See</u> 18 U.S.C. § 3553(a)(1).

The government acknowledges that the defendant's childhood, as reported by the defendant and his aunt, was marked by significant neglect and abuse. <u>See</u> PSR. ¶¶ 68-79. The defendant described turning to and embracing gang life in his search for community when he saw how gangs "took care" of their members by providing clothes, money, protection, access to women and popularity. PSR ¶ 80. He further described a desire to be "hood famous." <u>Id.</u> As such, the defendant joined both the Bloods and the Ninedee Gang.

The defendant, by choice, became a member of these violent street gangs and sought to earn status and respect within the Ninedee gang by being one of the two people to gun down a former federal witness—indeed, the exact type of crime that would give the defendant the notoriety that he sought. The defendant joined the Ninedee Gang with full knowledge of its mission, having grown up around co-defendant Fernandez. Trial Tr. at 1065-1066. The defendant did not live in the Pink Houses, but independently made the choice to involve himself with the Ninedee Gang and take actions that would solidify his status in the gang at the age of 19. He became known within the gang as a fighter and a shooter, and as someone that the gang could count on to commit violent crime. As a result, a substantial sentence is appropriate.

This is not the defendant's first conviction. The defendant previously served time for possessing a firearm and, prior to that, was placed on probation as a teenager for committing a violent robbery. PSR ¶¶ 59-60. Further, the defendant describes committing robberies throughout his life to support himself financially. PSR ¶¶ 102. One such example is his crime of conviction in this case, where he punched a female security guard with enough force to knock her to the ground in an effort to steal flat screen televisions from Target. This act was not gang-related; it was simply for the defendant's own financial gain.

The defendant's relentless violence while incarcerated, as detailed above, can also be considered by the Court. The defendant has repeatedly engaged in fights, disobeyed orders from corrections officers, secreted weapons and contributed negatively to the environment around him while incarcerated.

Thus, the "history and characteristics" of the defendant warrant the agreed upon sentence of 420 months.

C. <u>Respect for the Law, Just Punishment, the Need for Deterrence and Protecting the Public from Further Crimes of the Defendant</u>

With respect to the other Section 3553 factors, a sentence of 420 months' imprisonment will promote respect for the law, provide just punishment and provide adequate deterrence to the defendant himself and to others contemplating similar acts. <u>See</u> 18 U.S.C.

§ 3553(a)(2).  As discussed above, the seriousness of the murder of Shatavia Walls and the defendant's actions cannot be overstated.  The shooting of Ms. Walls in part because she had testified for the government threatens the ability of the government to prosecute crimes, such as the shooting committed by Shakeem Boykins, by discouraging witnesses from cooperating with law enforcement.  There is a true need for both general and specific deterrence in this case.  Engaging in the murder of a government witness shows an utter disregard for the law and for the justice system.  Such a sentence will also make clear to the defendant's associates and to anyone who considers killing an individual who cooperates with law enforcement that extraordinarily serious penalties will result.  The agreed upon sentence will serve as a warning to all that the murder of a government witness will be meaningfully punished.  Only a significant sentence can send this vital message not just to criminals, but to the members of the community that we need to come forward in order to continue to prosecute violent crimes.  If such individuals believe that they will be harmed or killed if they cooperate with law enforcement, our entire system of justice will grind to a halt.  Finally, such a sentence is necessary to protect the public by preventing the defendant from continuing to participate in gang-related crimes for as long as possible.

The defendant faced mandatory life in prison for his role in this murder.  In light of all of the circumstances of this case, the agreed-upon sentence of 420 months is appropriate and vital to serve the purposes of sentencing.

V.   Conclusion

Accordingly, for the foregoing reasons, the government respectfully asks the Court to impose a term of imprisonment of 420 months followed by five years of supervised release.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   */s/*
Emily J. Dean
Margaret Schierberl
Irisa Chen
Assistant U.S. Attorneys
(718) 254-6120 (Dean)

cc:   Clerk of the Court (LDH) (by ECF)
Elizabeth Macedonio, Esq. (by ECF and Email)
John Burke, Esq. (by ECF and Email)
Cheyanne Ralph, U.S. Probation Officer (by Email)